## THE TOLEDO TRUST CO. v. SIMMONS.

(Decided October 7, 1935.)

*Messrs. Yager, Bebout & Stecher,* for plaintiff in error.

*Messrs. Farber & Cochrane,* for defendant in error.

OVERMYER, J.   In this proceeding The Toledo Trust Company is seeking to reverse a judgment recovered against it by Lillian Brocklebank Simmons in the Court of Common Pleas.   The trust company will be referred to as the bank and Mrs. Simmons as plaintiff.

The facts presented by the record before us are as follows:   In the summer of 1920 the plaintiff was in

the employ of the Second National Bank of Toledo, since merged with The Toledo Trust Company, as an attendant in the safety deposit department. This safety deposit department then had between two and three hundred customers, and it was located off the main lobby of the bank. Access to this department was reached by way of a small lobby or entry at right angles to the main lobby, and off this small lobby was a cage with a window opening on the small lobby. There was also an electrically-operated door to the right of the window. The plaintiff's duties required her to be at this window in the cage, and customers and others desiring to enter the safety deposit department, or go through said door for any purpose, would call at this window, and upon being properly identified, plaintiff would press a button or switch which released the lock on the door near her cage and permitted entry to the safety deposit department, and other rooms in the rear of the bank. If the person entering was a safety-box depositor, the plaintiff would then leave the cage, and, by using the master key would give the customer access to his safety-box in the vault.

After passing through the electrically-operated door above referred to the customer or other person entered another small lobby or area-way, and there, upon his right was the plaintiff's work cage and upon his left was the safety deposit vault, with a customer-space to the left before the door of the vault. The lobby entered after passing the electrically-operated door gave access to other rooms in the rear on the first floor of the bank, and to other rooms on the second floor, and many employees and officers of the bank used this door daily in going to and from their work, and were admitted by the plaintiff; and, after being admitted, were free to go through other doors to various parts of the workrooms back of the various cages and to rooms in the rear on the first and second floors. On many occasions, also, visitors or business callers who desired

to confer with officers or employees on the first and second floors, were, upon proper identification, admitted through the electrically-operated door.

The area or lobby immediately entered upon passing through the electrically-operated door above referred to was therefore not entirely a public place or thoroughfare, because no one could enter it from the main lobby unless the plaintiff, or someone in her place, operated the electrical device to open the door, yet it was used every day by a number of persons who were not customers of the safety-box department of the bank.

On a day in July, 1920, during the noon hour, and while plaintiff was alone in the safety deposit department, she found on the floor of the lobby adjacent to her cage—the lobby entered when one was admitted through the electrically-operated door—and some feet from that door and just outside and to the left of the door to the cage, a long white envelope, unsealed, with no markings on it, which contained five hundred dollars in currency. She immediately took the envelope containing the money around the back of the bank past all the cages to the managing vice-president of the bank, and said: ''Look, Mr. Carr, I found this envelope on the floor of the entry-way to the safe deposit vault.'' Plaintiff testifies that Mr. Carr, the vice-president, said ''Thank you. I will hold it until it is claimed,'' and that plaintiff then said: ''In case it is not claimed, would the money be mine?'' That Mr. Carr then said: ''Yes, I would think so.'' Mr. Carr testifies that plaintiff further asked him: ''Well, if nobody claims it, does it belong to me?'' and that his reply was: ''Why I suppose it will.''

The bank kept the money in a tin box for a time and finally deposited it in a special trust account, where it still remains, no one ever having appeared to claim it.

In the course of the next few years plaintiff asked

the bank about the money on two or three occasions, and was always told that the money must be held longer against the possibility of the owner's appearance. In July, 1933, through an attorney, plaintiff for the first time made formal demand on the bank for the money, and then for the first time was definitely advised that the money would not be paid to her, and in December, 1934, she filed suit against the bank to recover the sum of $500 with interest.

On trial, a jury was waived and the finding and judgment of the Common Pleas Court was in favor of the plaintiff for the sum of $500, with interest from July 17, 1933. In seeking a reversal of this judgment the bank urges two of the various grounds of error assigned, viz.:

1. That the action is barred by the statute of limitations.

2. That the finding and judgment is contrary to and against the weight of the evidence and is contrary to law.

The claimed error as to the statute of limitations is not well taken. If, as claimed by the bank, the action falls within the provisions of Section 11224, General Code, relating to actions for the recovery of personal property, or for its unlawful detention, then the statute would not begin to run until demand for the money had been made by the plaintiff and the same had been refused by the bank. The record shows that not until 1933 did the plaintiff demand payment of the money and the bank refuse to pay it. All prior inquiries by the plaintiff were inquiries and no more, and these were met by the statements of the bank that they were required to hold it longer against the possibility of the owner's appearance. If the action does not come within the provisions of Section 11224, General Code, as claimed by the bank, then it comes within the provisions of Section 11236, General Code, which

specifically exempt continuing trusts from the provisions of the statute of limitations.

The rights of the parties in this controversy were fixed at the time the money was found by plaintiff and by her turned over to a representative of the bank, her superior. *Foster* v. *Fidelity Safe Deposit Co.,* 264 Mo., 89, 174 S. W., 376.

What were the rights of the parties at the moment the money was found by plaintiff and turned over by her to the bank? This depends entirely on the question whether the property involved was "lost" property or "mislaid" property. No one having been present when plaintiff found the money, her testimony as to where she found it stands uncontradicted, and there is no occasion to question her testimony, for her conduct in the entire transaction is not open to any criticism. It was probably her duty as an employee of the bank to report her find at once to the bank, but, by so doing, she did not relinquish her rights as finder, but specifically reserved her rights as finder if the owner should not appear to claim it. This money was not found in the safe deposit vault, nor in the safe deposit door-way, but was found on the floor in an entry-way or small lobby through which many persons passed every day; persons who were not customers of the safety-deposit department of the bank, and some persons who were not even customers of the bank at all but were allowed by the bank to go through this passageway or lobby to see various employees of the bank for personal calls.

There is, of course, not a word of evidence in the record which the court can consider as to who was the owner of the money. Under the law, in order to sustain the contention of the bank, we would have to assume that it was owned by a customer of the safety-deposit department of the bank. No such assumption can be entertained, considering the place where it was found, when the evidence is not disputed that

many other persons, some of them not even on bank business, passed through that entry-way daily.

Under the definitions of "lost property" as set forth in the following authorities and cases there cited, we hold that the money here involved was "lost" property, and the best proof of this fact is that in the fifteen years since it was found no owner has appeared to claim it. See 25 Ohio Jurisprudence, 801, 802; 25 Corpus Juris, 1134 *et seq.*; 17 Ruling Case Law, 1198 *et seq.*

This money having been "lost" property and not "mislaid" property, the rights of the parties are determined uniformly by an abundance of authorities. Neither the plaintiff nor the bank can secure title and become the absolute owner of the property. The most that either can have is the right to the possession and custody of the property, subject to the right of the owner to appear and claim it. The bank concedes it cannot become the owner, and contends only that as against the finder, the plaintiff, it has a superior right to hold the money indefinitely, awaiting the possible appearance of the owner.

Under the authorities, where property is found in a public or semi-public place, it is held that the owner or proprietor of the premises occupies no relationship of agent or fiduciary toward the owner of the property lost, and the right of possession and custody of the finder is superior, even though the finder be a servant or employee of the proprietor or owner of the premises where the personal property was found. The law is clear that the finder of "lost" personal property is entitled to the possession thereof as against all the world, except the rightful owner, and this is the law even though the finder is a servant or employee of the owner or proprietor of the premises wherein or whereon it is found. *Silcott* v. *Louisville Trust Co.*, 205 Ky., 234, 265 S. W., 612; *Foster* v. *Fidelity Safe Deposit Co., supra;* 25 Corpus Juris, 1136 *et seq.*; 25

Ohio Jurisprudence, 801 *et seq.*; 17 Ruling Case Law, 1198 *et seq.*

We find, under the undisputed facts and circumstances shown by the record, and under the authorities above cited, that the finding and judgment of the lower court is not erroneous, and the judgment will be affirmed.

*Judgment affirmed.*

LLOYD and CARPENTER, JJ., concur.